## THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

_____x
CHRISTOPHER HUDSON, in                                )
his individual capacity on behalf of himself          )
and others similarly situated,                        )
                                                      )
                            Plaintiff,                )
                                                      )
v.                                                    )          Civ. Action No.  1:18-cv-4483
                                                      )
NATIONAL FOOTBALL LEAGUE                              )          **CLASS ACTION COMPLAINT**
MANAGEMENT COUNCIL, NATIONAL                          )
FOOTBALL LEAGUE PLAYERS                               )
ASSOCIATION, RETIREMENT BOARD                         )
 OF THE BERT BELL/PETE                                )
ROZELLE NFL PLAYER RETIREMENT                         )
PLAN, KATHERINE "KATIE" BLACKBURN,                    )
RICHARD "DICK" CASS, TED PHILLIPS,                    )
SAMUEL MCCULLUM, ROBERT SMITH                         )
AND JEFFREY VAN NOTE,                                 )
                                                      )
                            Defendants.               )
_____x

Plaintiff, Chris Hudson, by and through his undersigned attorneys, brings this class action

complaint on behalf of himself and all others similarly situated allege facts related to his claim

based on personal knowledge and all other facts based on investigation of counsel.

### NATURE OF THE ACTION

1.      Plaintiff Christopher Hudson, a former, now-disabled NFL football player, brings

this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§

1001 et seq., on behalf of a Class of participants in and beneficiaries of the Bert Bell/Pete Rozelle

NFL Player Retirement Plan ("the Plan") against the fiduciaries of the Plan to remedy their failure

to make critical disclosures about the Plan that have harmed disabled participants to obtain

reclassification of their category of benefits under the Plan.

2.      Defendants are the administrators and fiduciaries of a disability retirement program

for NFL players.  The tier of benefit and accompanying level of compensation received depends in part on whether a player's injuries were sustained as a result of playing in the League. Unfortunately, many potentially disabling conditions experienced by NFL players may not be immediately diagnosable.

3.     In recent years, the scientific community has significantly increased its understanding of traumatic brain injuries, post-concussion syndrome, and/or chronic traumatic encephalopathy ("CTE"). Numerous articles have been published on the topic, both in scientific journals and in various media outlets. A study published in 2017 in the *Journal of the American Medical Association* found that the brains of 110 out of 111 deceased former NFL players showed signs of CTE. Moreover, the study found a relationship between behavioral and emotional symptoms and subsequent CTE diagnosis. Similarly, a subsequent study published on January 18, 2018 in the journal *Brain* found that that repetitive hits to the head can cause CTE even in the absence of such symptoms as loss of consciousness, headaches, dizziness, vision problems, or confusion.  These conditions, however, are difficult to diagnose, requiring extensive testing and ruling out other more common conditions.  This is further complicated by the cognitive limitations afflicted upon these players as a direct result of these conditions. It is thus possible and, indeed, common for victims of prior head trauma to experience years of debilitating and disabling symptoms before a conclusive diagnosis can be made or before additional evidence is obtained.

4.     As fiduciaries of the Plan, Defendants have an obligation, characterized as the highest known to the law, to fairly administer the retirement plan for these players and to make proper disclosure of important information about the terms of the Plan. Defendants have breached their duties to these players by failing to disclose and inform the players of the peril they face by

2

seeking benefits without first having a clear diagnosis and league counsel. Defendants have breached these duties by adopting undisclosed interpretations of key terms that are contrary to the language in the Summary Plan Description ("SPD") as that language would be understood by the average participant in the Plan. At the same time, the SPDs have expressly discouraged the players from engaging legal counsel in their initial claim for benefits when their disability is classified. Worst of all, Defendants do not reveal that these terms have a particular interpretation and the meaning of these undefined, and critical terms in the Plan until the very end of the administrative process when the player-participant has sought a reclassification.

5.       As a result of these failure to disclose, the players disabled by League-related head trauma will have sought an initial classification of benefits without being told that doing will jeopardize his ability to seek a classification at a different category or at the very least that he will be subject to a much higher standard of evidence and proof.  The effect of these failures to disclose, coupled with the discouragement of retaining counsel is that while the Plan purports allow for reclassification, these undisclosed terms and hidden interpretation of key provisions create a trap for the unwary so that it is effectively impossible for any of these players to ever see their disability status reclassified.

6.       On behalf of himself and the class, Plaintiff Hudson seeks to end this practice in order to require the Plan fiduciaries to make proper disclosures so that participants are fully informed about the standards and requirements when they seek benefit under the Plan.

### JURISDICTION AND VENUE

**Subject Matter Jurisdiction**

7.       This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

3

1331 because this action arises under the laws of the United States and pursuant to 29 U.S.C. § 1132(e)(1), which provides for federal jurisdiction of actions brought under Title 1 of ERISA.

**Personal Jurisdiction.**

8.     This Court has personal jurisdiction over Defendants because Defendants transact business in and have significant contacts with this District, and because ERISA provides for nationwide service of process pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

**Venue.**

9.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), and 28 U.S.C. 1391(b) and (c) because some of the breaches and violations giving rise to the claims occurred in this District, and at least one of the Defendants may be found in this District.

## THE PARTIES

10.     Plaintiff Christopher Hudson is a former professional football player with the National Football League (the "NFL") within the meaning of Article 1.29 of the 2009 Plan Document.  He began his career in the NFL with the Jacksonville Jaguars in 1995. Hudson played with the Jacksonville Jaguars from 1995 until 1999, the Chicago Bears from 1999 until 2001, and the Atlanta Falcons from 2001 until he retired from the NFL in 2003. Hudson is a "participant" in the Plan, as defined under 29 U.S.C. § 1002(7), and a "Vested Player" as defined in Article 1.37 of the Plan.

11.     Defendant National Football League Management Council is a non-profit association of clubs of the National Football League that is based in New York City.  Pursuant to Article 10.2 of the 2009 Plan Document, the Management Council when acting jointly with the

4

Players Association had the power to amend the Plan. Pursuant to Article 8.1 of the 2009 Plan Document, the NFL Management Council had the authority to appoint three voting members of the Retirement Board and also to remove and appoint a replacement for any member of the Retirement Board that the NFL Management Council has appointed.  By virtue of these powers to appoint and remove other fiduciaries, Defendant NFL Management Council was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and had the fiduciary responsibility to monitor the Retirement Board as an entity and the members of the Board whom it appointed, and remedy any fiduciary violations committed by the Retirement Board.

12.     Defendant National Football League Players Association is the labor organization representing the professional American football players in the National Football League. Pursuant to Article 10.2 of the 2009 Plan Document, the NFL Players Association when acting jointly with Management Council had the power to amend the Plan.  Pursuant to Article 8.1 of the 2009 Plan Document, the NFL Players Association had the authority to appoint three voting members of the Retirement Board and also to remove and appoint a replacement for any member of the Retirement Board that the Management Council has appointed.  By virtue of these powers to appoint and remove other fiduciaries, Defendant NFL Players Association was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and had the fiduciary responsibility to monitor the Retirement Board as an entity and the members of the Board whom it appointed, and remedy any fiduciary violations committed by the Retirement Board.

13.     Defendant Retirement Board is identified in Article 1.3 of the Plan Document as the designated Plan Administrator of the Plan within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A), and a named fiduciary of the ESOP within the meaning of ERISA § 402, 29 U.S.C.

§ 1102.  The Retirement Board is and has been a fiduciary of the Plan under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because it exercised discretionary authority or discretionary control respecting management of the ESOP, and/or had discretionary authority or discretionary responsibility in the administration of the ESOP. Specifically, under Article 8.2 of the Plan, Defendant Retirement Board was responsible for, *inter alia*, the following: defining the terms of the Plan and Trust; construing the Plan and Trust; reconciling any inconsistencies in the definition or interpretation of the Plan and Trust; deciding claims for benefits; paying all reasonable and necessary expenses of the Plan; adopting procedures, rules, and forms; delegating authority as necessary in administration of the Plan; selecting Trustees and setting forth terms of the Trust; commencing or defending suits or legal proceedings involving the Plan and the Trust; and settling, compromising, or submitting to arbitration for claims, debts, or damages due or owing to or from the Plan or Trust.  Pursuant to the SPD, the Retirement Board is composed of six voting members three of whom are selected by the National Football League Players Association (the "NFLPA") and three of whom are selected by the Management Council.

14.     Defendant Katherine "Katie" Blackburn is identified by the 2015 SPD and the 2013 SPD as one of the Management Members of the Retirement Board.  Defendant Blackburn is the Executive Vice President of the Cincinnati Bengals.  As a result of her membership on the Retirement Board of Directors, Defendant Blackburn is and has been at relevant times a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21).

15.     Defendant Richard W. "Dick" Cass is identified by the 2015 SPD and the 2013 SPD as one of the Management Members of the Retirement Board. Defendant Cass is the President of the Baltimore Ravens.  As a result of his membership on the Retirement Board of Directors,

Defendant Cass is and has been at relevant times a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21).

16.     Defendant Ted Phillips is identified by the 2015 SPD and the 2013 SPD as one of the Management Members of the Retirement Board. Defendant Phillips is the CEO/President of the Chicago Bears. As a result of is membership on the Retirement Board of Directors, Defendant Phillips is and has been at relevant times a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21).

17.     Defendant Samuel McCullum is identified by the 2015 SPD and the 2013 SPD as one of the Player Members of the Retirement Board.  As a result of his membership on the Retirement Board of Directors, Defendant McCullum is and has been at relevant times a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21).

18.     Defendant Robert Smith is identified by the 2015 SPD and the 2013 SPD as one of the Player Members of the Retirement Board.  As a result of his membership on the Retirement Board of Directors, Defendant Smith is and has been at relevant times a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21).

19.     Defendant Jeffrey Van Note is identified by the 2015 SPD and the 2013 SPD as one of the Player Members of the Retirement Board.  As a result of her membership on the Retirement Board of Directors, Defendant Blackburn is and has been at relevant times a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21).

20.     The "Board Defendants" collectively refer to Defendants Blackburn, Cass, Phillips, McCullum, Smith, Van Note and the Retirement Board as an entity.

## FACTUAL ALLEGATIONS

**The Retirement Plan**

21.    The Bert Bell/Pete Rozelle NFL Player Retirement Plan is an employee pension benefit plan within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).  The relevant written instrument of the Plan within the meaning of ERISA § 402(a) is the Bert Bell/Pete Rozelle NFL Player Retirement Plan Amended and Restated as of April 1, 2009).  Since at least 1994, Plan has provided retirement, disability, and related benefits to eligible professional football players. Even though there is a separate NFL Player Supplemental Disability & Neurocognitive Benefit Plan, that Plan only applies to benefits payable, and claims for benefits made, on or after April 1, 2017.  The Bert Bell/Pete Rozelle NFL Player Retirement Plan continues to pay total and permanent disability benefits based on claims filed prior to January 1, 2015. The Bert Bell/Pete Rozelle NFL Player Retirement Plan is the Plan that governs Plaintiff's disability benefits.

22.    Article 5 of the 2009 Plan Document addresses Total and Permanent Disability ("T&P") benefits.  Article 5.1 defines "Eligibility and Amount" as follows: "Any Active Player or Vested Inactive Player . . . who is not receiving retirement benefits and is determined by the Retirement Board or the Disability Initial Claims Committee to be totally and permanently disabled as defined in section 5.2, and who satisfies the other requirements of this Section 5, will receive a monthly total and permanent disability benefit for the months described in sections 5.6 and 5.7[]."

23.    Article 1.36 of the 2009 Plan Document defines "Vested Inactive Player" to mean a "Vested Player who is not an Active Player."  Article 1.37 of the Plan defines "Vested Player" as a Player who "(a) earns five Credited seasons…"  Article 2 address eligibility under the Plan,

noting that "[a]ll Players participate in the Plan."

24.     Article 5.1(d) of the 2009 Plan Document provides for Inactive benefits as follows: "This category applies if (1) the total and permanent disability arises from other than league football activities while the Player is a Vested Inactive Player, or (2) the disability(ies) arises out of League football activities and results in total and permanent disability fifteen or more years after the end of the Player's last Credited Season.  The minimum benefits provided under this Section 5.1(d) will be offset by any disability benefits provided by an employer other than the League or an Employer, but will not be offset by worker's compensation."

25.     Article 5.1 of the 2009 Plan Document also provides four categories of T&P benefits, two of which are relevant.  First, Article 5.1(c) provides for Football Degenerative ("FD") benefits as follows: "The monthly total and permanent disability benefits will be no less than $4,000 if the disability(ies) arises out of League football activities, and results in total and permanent disability before fifteen years after the end of the Player's last Credited Season." Payments for Football Degenerative benefits have been routinely increased each year.  Monthly payments from 2010 to August 2011 were $8,167.00; from September 2011 to December 2015 payments were $9,000; and from January 2016 to present, monthly payments are $10,250.00. Conversely, payments for monthly T&P benefits were $2,300.50 from October 2010 to August 2011; $3,333.50 from September 2011 to December 2015; and $4,166.50 from January 2016 to present.

26.     Article 5.2(a) of the 2009 Plan Document provides that "An eligible Player will be deemed to be totally and permanently disabled if the Retirement Board or the Disability Initial Claims committee finds that he has become totally disabled to the extent that he is substantially

prevented from or substantially unable to engage in any occupation or employment for remuneration or profit, but expressly excluding any disability suffered while in the military service of any country[]."  At the time of the Board decision at issue, Article 5.2(b) of the Plan provided:

> Social Security Awards. Effective April 1, 2007, a Player who has been determined by the Social Security Administration to be eligible for disability benefits under either the Social Security disability insurance program or Supplemental Security Income program, and who is still receiving such benefits at the time he applies, will be deemed to be totally and permanently disabled . . .

Solomon v. Bert Bell Pete Rozelle NFL Player Ret. Plan, 2016 U.S. Dist. LEXIS 27748, *10-11 (D. Md. Mar. 4, 2016).

27.    Article 5.5(a) of the 2009 Plan Document, entitled Initial Classification, provides "Classification of total and permanent disability benefits under Section 5.1 will be determined by the Retirement Board or the Disability Initial Claims Committee in all cases on the facts and circumstances in the administrative record[]."

28.    Article 5.5(b) of the 2009 Plan Document, entitled Reclassification, provides: "A Player who becomes totally and permanently disabled and who satisfies the conditions of eligibility for benefits under Section 5.1(a), 5.1(b), 5.1(c), or 5.1(d) will be deemed to continue to be eligible only for the category of benefits for which he first qualifies, unless the Player shows by evidence found by the Retirement board or the Disability Initial Claims Committee to be clear and convincing that, because of changed circumstances, the Player satisfies the conditions of eligibility for a benefit under a different category of total and permanent disability benefits…"

29.    The Summary Plan Documents presented to the Players actively discouraged players from retaining counsel. The April 2013 Summary Plan Document and the 2015 Summary Plan Document both stated:

The application forms have been streamlined and you should find them easy to complete. If you have any questions, you can call the Plan Office and ask for assistance. If you wish, the staff will fill out the application as you direct and send it to you for your signature.

You are entitled to retain an attorney or advisor should you wish to do so for any reason. However, many attorneys demand a significant portion of your disability benefits just to file the initial application.

Similarly, the Summary Plan Documents presented to the Players do not explain the effect in timing that could occur if they seek Social Security Disability benefits after having sought total and permanent disability benefits.

30.     None of the materials provided by Retirement Board defined the term "changed circumstances" and Retirement Board did not notify Hudson of the definition of changed circumstances until his last and final appeal of FD benefits. Plan participants were provided documents meant to explain the policies and procedures of the Plan, including reclassification of benefit status. In these materials, the only discussion of "changed circumstances" is as follows:

As long as you remain totally and permanently disabled, you will continue to receive total and permanent disability benefits under the category for which you first qualify, unless you present evidence for reclassification that the Disability Initial Claims Committee or the Retirement Board finds to be clear and convincing. You must be able to demonstrate that, because of change of circumstances, you satisfy the conditions of eligibility for a benefit under a different category of total and permanent disability benefits.

**Chris Hudson's Claim and Appeal of Benefits**

31.     Plaintiff Christopher Hudson played football for the NFL for a total of 8 years in the position of safety.  Over the course of his career with the NFL in the position of safety, Hudson sustained numerous hits to the head.  Just two years after his 2003 retirement from the NFL, in 2005, Hudson began complaining of headaches, dizziness, ringing ears, and blurred vision.  These

problems worsened in 2008, when Hudson began experiencing increased anxiety, poor decision making, inability to sit still for long periods of time, sleep problems, decreased ability to concentrate, social withdrawal, memory problems (forgetting the names of familiar people), increased occurrence of headaches, and sensitivity to lights.

32. Participants in the NFL Plan are eligible to apply for both T&P disability benefits and FD benefits. Hudson filed an initial application for disability under the Plan on March 9, 2010. After his claim was initially denied, Hudson filed an appeal with Retirement Board on July 27, 2010 and Hudson was sent to "MAP neuro Rehab Institute of Chicago" for further testing. Subsequently, the Retirement Board awarded Plaintiff T&P disability benefits under the Plan on May 20, 2011.

33. In its May 20, 2011 decision, the Retirement Board determined that Hudson was ineligible for FD benefits. In its decision, Retirement Board concluded that Hudson was "severely depressed" and experienced cognitive impairments attributable to non-League related mood disorder.  In subsequent communications with Hudson on November 28, 2011, Retirement Board explained that it had determined that T&P related injuries were "not related to League football activities."

34. After the May 20, 2011 award of T&P benefits, Hudson filed for Social Security disability benefits on June 27, 2012. On May 5, 2014, the Social Security Administration found that Hudson was disabled as of December 31, 2009.

35. Subsequent to the Social Security Administration's decision, Hudson, proceeding *pro se*, sought for his T&P Benefits to be reclassified as FD Benefits by filing a claim for benefits under the Plan on September 16, 2014. As part of his request for reclassification, Hudson explained

that he had "clear and convincing evidence" of "changed circumstances" within the meaning of the Plan, or at least the SPD, based, in part, on Social Security Administration's decision as well as a mental residual functional capacity questionnaire completed by Dr. Samuel Holcombe.

36.     On October 8, 2014, the Retirement Board denied Hudson's request for reclassification. In its decision, the Initial Claims Committee never defined how the Committee or the Retirement Board interpreted "changed circumstances."   Moreover, the Initial Claims Committee never explained how it weighed the evidence submitted by Hudson for its consideration. In its denial, the Initial Claims Committee also notified Hudson of his right to appeal as well as his ability to "submit written comments, documents and any other information that you believe shows you qualify for these benefits."

37.     On March 27, 2015, Hudson appealed Retirement Board's decision. As part of his appeal of the denial of reclassification, Hudson presented the Retirement Board with numerous pieces of new medical evidence for its consideration.

38.     In a decision dated May 21, 2015, but received by Mr. Hudson on May 27, 2015, Defendant Retirement Board issued its final decision denying Hudson's appeal for reclassification, finding that Hudson failed to meet its "changed circumstances" requirement:

> At its May 14, 2015 meeting, the Retirement Board reviewed the entire record underlying your appeal and determined that your request for reclassification must be denied.  Section 5.55(b) governs requests for reclassification such as yours, and it permits reclassification of T&P benefits only where a Player provides "clear and convincing" evidence of "changed circumstances" warranting "a different category of total and permanent disability benefits."   In this and all other instances, the Retirement Board interpret Section 5.5(b)'s "changed circumstances" requirement to mean a change in Player's physical condition—such as a new or different impairment—that warrants a different category of benefits.

39.     In its denial, Retirement Board – for the first time – provided Hudson with a written

explanation of how it interprets "changed circumstances."  This explanation was never conveyed to Hudson in any way prior to the final denial. Furthermore, the record contains no proof that Retirement Board submitted any of the evidence Hudson provided to any medical source for evaluation and consideration prior to making its final decision.

**Chris Hudson's Requests for Information to Retirement Board**

40.    After the final denial, Hudson filed a federal complaint in the Northern District of Mississippi. Hudson and Defendants later entered into a voluntary remand for further consideration at the administrative level by the Retirement Board. Subsequently, the parties attempted to work out a fair and impartial method for reaching an unbiased resolution in this case.

41.    On April 1, 2016, Hudson's counsel sent the Plan Director, Michael Miller, and counsel for the Plan, Michael Junk, a Request for Clarification/Request for Information regarding the Plan's definition of "changed circumstance" and Retirement Board's definition of "impairment."  Mr. Junk responded in writing, citing *Bryant v. Bert Bell/Pete Rozelle NFL Player Retirement Plan*, U.S. Dist. LEXIS 176748, *18 (N.D. Ga. Mar. 23, 2015) and *Boyd v. Bert Bell/Pete Rozelle NFL Player Retirement Plan*, 796 F. Supp 2d. 682, 693 (D. Md. 2011) and noting that "two prior court decisions upholding the Retirement Board's interpretation and application of the 'changed circumstances.'" Mr. Junk further stated that he and his colleagues are "unaware of any other instance in which the Retirement Board has interpreted the 'changed circumstances' requirement in a manner different than that explained in *Boyd*, *Bryant*, and Hudson's case…this consistency is not surprising, given that consistence is one the of the hallmarks of reasonableness in plan interpretation." In addition, Mr. Junk refused to respond to Hudson's request for the definition of the term "impairment" because "it amounts to a request for an advance advisory

14

opinion on the [term]."

42.    On June 13, 2016, Hudson sent Mr. Miller and Mr. Junk a Second Request for Clarification/Request for Information. This second request, again, asked for a list of all instances where the Retirement Board has interpreted thee "changed circumstances" requirement under Article 5.5(b) of the Plan as well as how Retirement Board defines the term "impairment."  Neither Miller nor Junk responded to the second request.

43.    Hudson renewed his requests in a Third Request for Clarification/Request for Information on September 30, 2016.  In this request, Hudson added several requests "in order to analyze the Retirement Board's use of discretion in this case, and whether it abused that discretion."  Hudson also sent a Request for Production of Documents – Plan Neutral Training Materials.  No materials were produced in response.

44.    On November 22, 2016, the Plan issued its "Final Decision Regarding Request for Reclassification," denying Hudson's request to be reclassified from T&P to Football Degenerative.

45.    On December 12, 2016, Hudson sent Retirement Board a Second Request for Production of Documents – Plan Neutral Physician Training Materials because he had not received a response to his September 30, 2016 request for these materials. Hudson relied on ERISA regulations in support of his requests that state that a claimant shall be provided or given reasonable access to documents relevant to their claim. In response, Junk's December 19, 2016 letter stated that he refused to respond to Hudson's request for documents on the grounds that the documents requested were not relevant.

46.    Hudson responded with a Follow-up Request for Production of Documents/Request for Information on December 29, 2016, again citing 29 C.F.R. 2560.503-1(m)(8) definition of

"relevant documents." Junk responded with a letter dated January 10, 2017, maintaining that "[t]he Retirement Board's decision on Hudson's request for classification is final, it will not be reopened, and the Plan will not produce any of the documents you have requested."

**Hudson Requests Information About An Amendment to the Disability Plan**

47.     In February 2018, Hudson received a notice of a summary of material modifications to the NFL Player Disability & Neurocognitive Benefit Plan, including a modification regarding "[t]he standard for reclassifying [participants'] total and permanent disability benefits" including an amendment that appears to modify the standard as to what constitutes "changed circumstances" under that Plan.   Hudson has not received any notice of a summary of similar material modifications to the Bert Bell/Pete Rozelle NFL Player Retirement Plan.

48.     After receipt of that notice, Hudson's counsel sent a letter on March 2, 2018, on behalf of Hudson to the Retirement Board as Plan Administrator of Bert Bell / Pete Rozelle NFL Player Retirement Plan inquiring these changes "were meant to apply retroactively to persons such as Mr. Hudson."  By a separate letter on March 2, 2018, Hudson's counsel also made a request on behalf of Hudson pursuant to ERISA § 104(b)(4), 29 U.S.C. § 1024(b)(4) requesting that the Plan Administrator of the NFL Player Disability & Neurocognitive Benefit Plan provide copies of certain documents.

49.     The members of Retirement Board, which serves as Plan Administrator of Bert Bell / Pete Rozelle NFL Player Retirement Plan, are identical to the members of the Disability Board, which serves as Plan Administrator of the NFL Player Disability & Neurocognitive Benefit Plan.

50.     In response to Hudson's request for documents, on March 13, 2018 the Retirement Board sent Hudson's counsel the NFL Player Disability & Neurocognitive Benefit Plan (Amended

and Restated as of April 1, 2017), a Summary of Material Modifications (undated), and a Summary Plan Description (dated September 2015).

51.    The Retirement Board did not respond to Hudson's question about whether the Board intended to have the 2017 Amendment to the NFL Player Disability & Neurocognitive Benefit Plan apply to Hudson's claim for benefits. On March 15, 2018, outside counsel for the Board, Michael Junk of the Groom Law Group, sent an email to Hudson's counsel, stating the Board would not answer his question by stating: "We will not ask the Retirement Board for what amounts to an advisory opinion on questions that, frankly, we do not even understand."

## CLASS ACTION ALLEGATIONS

52.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following persons Class:

All participants of the Plan and who filed a claim seeking total and permanent disability benefits prior to January 1, 2015 and the beneficiaries of such persons.

53.    Excluded from the Class are Defendants and persons who were named fiduciaries of the Plan, the officers and directors of the NFL Management Council, the officers and directors of the NFL Players Association, the members the immediate families of any of the foregoing; and legal representatives, successors, heirs, and assigns of any such excluded persons.

**Impracticability of Joinder**

54.    The members of the Class are so numerous that joinder of all members is impracticable. The exact number of class members is unknown to Plaintiff.  The Plan's most recent Form 5500, the 2016 Form 5500 filed with the Department of Labor on December 20, 2017 reports that 3,716 retired or separated participants were actively receiving benefits as well as an additional

694 deceased participants whose beneficiaries were receiving or were entitled to receive benefits. The Plan's Form 5500 did not specify the number of those participants who are receiving disability benefits. According to the 2009 Retirement Plan Document, football-related disability rates were expected to be 0.10% per year for Active Players and 0.08% per year for inactive Players until age 45. Moreover, the Retirement Plan Document (Amended and Restated as of April 1, 2012) noted a significant increase in expected incidence of football-related disability: 0.35% per year for Active Players and 0.28% per year for Inactive Players up to 15 years after the player's last credited season. In the Report of the Segal Group to the Special Master as part of the NFL Concussion Litigation, 28% of the overall player population were expected to receive a qualifying diagnosis within their lifetime. Accordingly, there are hundreds, if not thousands of Plan participants who have been initially classified for disability benefits under the Plan who would be subject to the "changed circumstances" standard for reclassification.

**Commonality**

55.     The issues of liability are common to all members of the Class and are capable of common answers as those issues include:

a.      Whether the Board violated ERISA § 102(a) with respect to the SPDs that were issued to Plaintiff and the Class;

b.      whether Defendants breached their fiduciary duties to Plaintiff, and members of the Class by failing to act prudently and solely in the interests of the Plan and the Plan's participants and beneficiaries in connection with their failure to disclose important issues related to the standards for reclassification and the meaning of "changed circumstances;"

c.      whether the NFL Management Council and the NFL Players Association breached

their duty to monitor the Board Defendants;

d.      whether the 2017 Amendment is invalid as to Plaintiff and the Class; and

e.      the appropriate remedies and relief for Defendants' violations and breaches.

**Typicality**

56.      Plaintiff's claims are typical of the claims of other members of the Class because their claims arise from the same event, practice and/or course of conduct. Specifically, Plaintiff, on behalf of the Class, alleges that Defendants breached their fiduciary duties or otherwise violated ERISA in connection with the disclosures made to all participants with respect to the Plan's reclassification process. Plaintiff's claims are also typical of the claims of the Class because they generally seek recovery and relief that will result in a declaration and injunction for the Class.

**Adequacy**

57.      Plaintiff will fairly and adequately represent and protect the interests of the Class.

58.      Plaintiff does not have any interests antagonistic to or in conflict with those of the Class.

59.      Defendants have no unique defenses against Plaintiff that would interfere with Plaintiff's representation of the Class.

60.      Plaintiff is represented by counsel with extensive experience prosecuting class actions in general and ERISA class actions in particular.

**Fed. R. Civ. P. 23(b)(1)(A)**

61.      The requirements of Fed. R. Civ. P. 23(b)(1)(A) are satisfied. Fiduciaries of ERISA-covered plans have a legal obligation to act consistently with respect to all similarly situated participants and to act in the best interests of the Plan and their participants. This action

challenges whether Defendants acted consistently with their fiduciary duties or otherwise violated ERISA with respect to activities that affected all class members uniformly. As a result, prosecution of separate claims by individual members would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct relating to the Plan.

**Fed. R. Civ. P. 23(b)(1)(B)**

62.    The requirements of Fed. R. Civ. P. 23(b)(1)(B) are also satisfied. Administration of an ERISA-covered plan requires that all similarly situated participants to be treated the same. Resolving whether Defendants each owed a fiduciary duty to the Plan, Plaintiff and members of the Class; whether Defendants fulfilled their fiduciary obligations to the Plan, violated ERISA or as to Plaintiff would, as a practical matter, be dispositive of the interests of the other participants in the Plan even if they are not parties to this litigation and would substantially impair or impede their ability to protect their interests if they are not made parties to this litigation by being included in the Class.

**Fed. R. Civ. P. 23(b)(2)**

63.    The requirements of Fed. R. Civ. P. 23(b)(2) are satisfied as to the Class because Defendants have acted and/or failed to act on grounds generally applicable to the Class, making declaratory and injunctive appropriate with respect to the Class as a whole. This action challenges whether Defendants acted consistently with their fiduciary duties or otherwise violated ERISA as to the Class as a whole. The relief sought in this case primarily consists of declarations that Defendants breached their fiduciary duties or engaged in other violations of ERISA and injunctive relief. As ERISA is based on trust law, any monetary relief consists of equitable monetary relief and is either provided directly by the declaratory or injunctive relief or flows as a necessary

20

consequence of that relief.

**Fed. R. Civ. P. 23(b)(3)**

64.    The requirements of Fed. R. Civ. Pr. 23(b)(3) are also satisfied. The common questions of law and fact concern whether Defendants breached their fiduciary duties or violated ERISA to the Plan. As the members of the Class were participants in the Plan, their rights and benefits were affected by those breaches and violations. Common questions related to liability will necessarily predominate over any individual questions precisely because Defendants' duties and obligations were uniform to all participants and therefore all members of the Class. As relief and any recovery will be on behalf of the Plan, common questions as to remedies will likewise predominate over any individual issues.

65.    A class action is a superior method to other available methods of the fair and efficient adjudication of this action. Resolution of the issues in this litigation will be efficiently resolved in a single proceeding rather than multiple proceedings and each of those individual proceedings could seek recovery for the entire Plan. Class certification is a superior method of proceeding because it will obviate the need for unduly duplicative litigation which might result in inconsistent judgments about Defendants' duties with regard to the Plan.

66.    The following factors set forth in Rule 23(b)(3) also support certification:

a.    The members of the Class have an interest in a unitary adjudication of the issues presented in this action for the reasons that this case should be certified under Rule 23(b)(1).

b.    No other litigation concerning this controversy has been filed by any other members of the Class.

c.      This District is the most desirable location for concentrating this litigation because the National Football League is headquartered in this District, Defendant National Football League Management Council is headquartered in this District and the individual Defendants are believed to have significant contacts in this District and at least some of the breaches took place in this District.

d.      As the relief sought is primarily declaratory and injunctive, there are no management issues that present difficulties to manage this case as a class action.

<u>COUNT I</u>
**Violation of ERISA § 102(a), 29 U.S.C. § 1022(a)**
**Against the Retirement Board**

67.     Plaintiffs incorporate and re-allege by reference each of the foregoing paragraphs as if fully set forth herein.

68.     ERISA § 102(a), 29 U.S.C. § 1022(a), requires SPDs to "be written in a manner calculated to be understood by the average plan participant" and to "be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan."

69.     The DOL Regulations implementing ERISA § 102, 29 C.F.R. § 2520.102-2(a), reiterate that the SPD "shall be written in a manner calculated to be understood by the average plan participant and shall be sufficiently comprehensive to apprise the plan's participants and beneficiaries of their rights and obligations under the plan."  29 C.F.R. § 2520.102-2(a) specifies that in order to fulfill these requirements, the plan administrator must "tak[e] into account such factors such as the level of comprehension and education of the *typical participants in the plan* and the complexity of the terms of the plan."  29 C.F.R. § 2520.102-2(a) further explains that in order to make the SPD understandable to the average participant, the SPD "will usually require

the limitation or the elimination of technical jargon and of long, complex sentence. . .[and] the use of clarifying examples and illustrations."

70.     Through at least the 2015 SPD, the SPDs explained that as long as a participant remained totally and permanently disabled, a participant would continue to receive benefits under the category for which the participant first qualified, "unless [the participant] present[ed] evidence for reclassification that the Disability Initial Claims Committee or the Retirement Board finds to be clear and convincing."

71.     At least through the time when the 2015 SPD was distributed to player-participants, the SPD did not set forth an explanation of what constituted "clear and convincing evidence." None of those SPDs explained that "clear and convincing evidence" was legal standard or legal jargon.  The SPD did not provide any examples of what would or would not constitute "clear and convincing evidence" sufficient to demonstrate reclassification.

72.     The ordinary definition of the word "clear" is "easy to perceive, understand, or interpret."  The ordinary definition of "convincing" is "capable of causing someone to believe that something is true or real." As the average participant in this plan was not a lawyer, utilizing the normal and ordinary meanings of these terms, the average participant in this plan would have understood that the evidence that needed to be presented was evidence that was both "easy to understand or interpret" and also "capable of causing someone to believe that something is true or real."

73.     Only after submitting his claim for benefits requesting a reclassification, Plaintiff discovered that the Board Defendants were not using the plain and ordinary definition for the terms "clear and convincing evidence" but were using legal jargon.

74.     Through at least the November 2015 SPD (which would have been distributed to participants after 2015), the SPD explained that to qualify for a reclassification, the participant "must be able to demonstrate that, because of changed circumstances, [the participant] satisif[ied]

23

the conditions of eligibility for a benefit under a different category of total and permanent disability benefits."

75.    At least through the time when the November 2015 SPD was distributed to player-participants (which was distributed to participants after 2015), the SPD did not provide any explanation of what the phrase "changed circumstances" meant.  None of those SPDs explained that "changed circumstances" had a particular meaning or that the Board had reached a specific interpretation of that phrase. Those SPDs provided no examples or illustrations what would or would not constitute "changed circumstances sufficient to satisfy the conditions of eligibility for a benefit under a different category.

76.    The ordinary meaning of a circumstance is "a fact or condition connected with or relevant to an event or action."  And the ordinary definition of "changed" is simply "different." Utilizing the normal and ordinary meanings of these words, this phrase conveyed to the average participant in this plan that a fact or condition connected with or relevant to the participant's disability benefits was different than before.

77.    Only after submitting his claim for benefits requesting a reclassification, Plaintiff discovered that the Disability Board Defendants were not using the plain and ordinary definition for the words "changed circumstance" but had a specific interpretation that was not disclosed until 2017.

78.    Additionally, the SPDs at least through 2015 specifically discouraged participants from hiring an attorney by explaining that the application would be "easy to complete" and that attorneys would "demand a significant portion of your disability benefit."  Thus, these SPDs discouraged players from hiring an attorney by portraying attorneys as unnecessary expenses.

79.    By failing to draft an SPD through at least the 2015 that properly explained the requirements to obtain a reclassification or to satisfy the conditions for eligibility for a benefit

under a different category of benefits, the Disability Board violated ERISA § 102, 29 U.S.C.

§ 1022(a).

80.    As a result of this violation, Plaintiff and the other members of the Class were not

properly informed that subsequently seeking reclassification and/or modification of their category

of benefits would require a higher standard and by completing the "easy" application early, they

would unnecessarily lock themselves into a lower category of benefits.

**COUNT II**
**Breach of Fiduciary Duty Pursuant to ERISA § 404(a)(A)(1)(A) & (B), 29 U.S.C.**
**§ 1104(a)(A) & (B) For Failure to Disclose Against the Board Defendants**

81.    Plaintiffs incorporate and re-allege by reference each of the foregoing paragraphs

as if fully set forth herein.

82.    ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), requires that a plan fiduciary discharge

his or her duties with respect to a plan solely in the interest of the participants and beneficiaries

and (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries;

and …. (B) with "care, skill, prudence, and diligence."

83.    An ERISA fiduciary's duty of loyalty and prudence under ERISA § 404(a)(1)(A)

and (B) includes a duty to disclose and inform.  Those duties not only require that a fiduciary

comply the specific disclosure provisions in ERISA, but also require (a) a duty not to misinform,

(b) an affirmative duty to inform when the fiduciary knows or should know that silence might be

harmful, and (c) a duty to convey complete and accurate information material to the circumstances

of the participants and beneficiaries.

84.    The Board Defendants had an affirmative duty to disclose that the term "changed

circumstances" had been interpreted in a specific manner by the Board in advance of the time that

Plaintiff and the Class filed their initial claim for benefits seeking a determination of disability

benefits under the Plan.

85.     None of the materials provided by Board to Plaintiff, or upon information and belief other participants, defined the term "changed circumstances" or otherwise advised participants that there was a specific interpretation of the phrase "changed circumstances" until or after their last and final appeal of FD benefits.

86.     Not until the Final Appeal on his request for reclassification did the Board Defendants advise Plaintiff, and upon information and belief, other participants that "the Board interprets Section 5.5(b)'s 'changed circumstances' requirement to mean a change in Player's physical condition—such as a new or different impairment—that warrants a different category of benefits."

87.     By failing to communication this information about the interpretation of the standard necessary to obtain a reclassification or to satisfy the conditions for eligibility for a benefit under a different category of benefits, the Disability Board Defendants violated ERISA § 404(a)(1)(A) & (B), 29 U.S.C. § 1104(a)(1)(A) & (B).

88.     As a result of this violation, Plaintiff and the other members of the Class were not properly informed that subsequently seeking reclassification and/or modification of their category of benefits would require a higher standard and that seeking any early application would unnecessarily lock themselves into a lower category of benefits.

## COUNT III
### Breach of Fiduciary Duty Under ERISA §§ 404(a)(1)(A), (B) and (D), 29 U.S.C. §§ 1104(a)(1)(A), (B) and (D) For Failure to Monitor Against the NFL Management Council and the NFL Players Association

89.     Plaintiffs incorporate the preceding paragraphs as though set forth herein.

90.     ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), requires that a plan fiduciary discharge his or her duties with respect to a plan solely in the interest of the participants and beneficiaries, (A) for the exclusive purpose of providing benefits to participants and the beneficiaries of the plan, (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a

prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with ERISA.

91.    Under ERISA § 404(a)(1)(A) and (B), a fiduciary with the authority to appoint and/or remove other fiduciaries has an obligation to undertake an appropriate investigation that the fiduciary is qualified to serve in the position as fiduciary and at reasonable intervals to ensure that the fiduciary who has been appointed remains qualified to act as fiduciary and is acting in compliance with the terms of the Plan and in accordance with ERISA.

92.    Pursuant to Article 8.1 of the 2009 Plan Document, the NFL Management Council and the NFL Players Association each had the authority to appoint three voting members of the Retirement Board and also to remove and appoint a replacement for any member of the Retirement Board that they had appointed.

93.    The NFL Management Council and the NFL Players Association knew or in the exercise of reasonable diligence, should have known that the (a) SPDs did not set forth an explanation of what constituted "clear and convincing evidence" or "changed circumstances," (b) the Board Defendants had interpreted "clear and convincing evidence" or "changed circumstances," (c) the interpretation of "clear and convincing evidence" or "changed circumstances," utilized by the Board Defendants was not the meaning of those terms and phrases as would be understood by the average participant in this Plan, (d) the Board Defendants did not disclose the meaning of those terms and phrases to participants until after their initial classification had been determined or until the participant sought reclassification (sometimes not until the final internal appeal), (e) the SPDs discouraged participants from hiring an attorney to advise them in connection with their initial claim for benefits, and (f) given the Board Defendants' interpretation and application of the phrases, "clear and convincing evidence" or "changed circumstances,"

participants would be harmed by applying for benefits before all the information and evidence was available to establish their proper classification.

94.     Had the NFL Management Council and the NFL Players Association properly monitored the Board Defendants, the NFL Management Council and the NFL Players Association should have done at least one or more of the following: (a) require the Board to revise the SPD to set forth an explanation of what constituted "clear and convincing evidence" or "changed circumstances" in language that the average participant in this Plan would understand, without the use of legal jargon and by using clarifying examples and illustrations; (b) require that the Board Defendants disclose how they had interpreted "clear and convincing evidence" and "changed circumstances" prior to the time that participants sought initial classification, (c) require the Board Defendants to utilize a definition of "clear and convincing evidence" and "changed circumstances" consistent with their ordinary meaning as those terms and phrases would be understood by the average participant in this Plan, (d) require the Board Defendants to review and reevaluate any claim for reclassification where the Board had failed to disclose the meaning of those terms and phrases to participants until after their initial classification had been determined, (e) remove the language in the SPD discouraging participants from hiring an attorney to advise them in connection with their initial claim for benefits, and/or (f) remove and replace the existing Board Defendants.

95.     By failing to properly monitor the Board Defendants and/or failing to take appropriate action upon learning that the Board Defendants had breached their duties, the NFL Management Council and the NFL Players Association breached their fiduciary duties under ERISA § 404(a)(1)(A), (B) & (D), 29 U.S.C. § 1104(a)(1)(A), (B) & (D).

### COUNT IV
**Invalidation of the 2017 Amendment & Enforcement of the Terms of the Pre-2017 Plan Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Against All Defendants**

96.     Plaintiff incorporates the preceding paragraphs as though set forth herein.

97.     ERISA § 502(a)(3), 29 U.S.C. § 1102(a)(3), authorizes a plan participant to bring a civil action (A) to enjoin any act or practice which violates any provision of ERISA or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress violations of ERISA or the terms of the plan or (ii) to enforce any provisions of ERISA or the terms of the plan.

98.     Relief is unavailable under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) or the remedy under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) is not adequate because this claims does not seek a determination of Plaintiff's rights or benefit under the terms of the Plan, but a determination that the Amendment enacted on August 16, 2017 but made retroactive to April 1, 2017 do not and cannot apply to the claims of Plaintiff and the Class.  Therefore, a claim challenging the validity of the August 2017 Amendment is properly brought under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

99.     As a matter of both federal common law and the common law of contract, which apply to ERISA plans, the terms of the Plan are fixed at the time when performance is complete or when the participants' benefits otherwise vest.  At the latest, once a participant has become eligible for benefits under the terms of the plan, the terms of the plan in effect on that date are the terms that govern the benefits owed to and to be paid to the participant.

100.    The 2017 Amendment is invalid to the extent that it applies to Plaintiff and The Class as these participants of the Plan had become eligible for disability benefits prior to August 16, 2017.

101.    As a result, Plaintiffs and the Class are entitled to have the 2017 Amendment declared invalid as to them, to a declaration that their rights and benefits are and will be determined under the Plan in effect when they became eligible for benefits and, as necessary, Plaintiffs and

the Class are entitled to have the Plan reformed accordingly and/or to an injunction requiring administration of the Plan in a manner consistent with the terms of the Plan in existence at the time they became eligible for benefits.

## COUNT V
**Violation of ERISA § 410 & ERISA § 404(a)(1)(A), (B) Against All Defendants**

102.    Plaintiffs incorporate the allegations contained in the foregoing paragraphs as if fully set forth herein.

103.    ERISA § 410(a), 29 U.S.C. § 1110(a), provides in relevant part (with exceptions not applicable here) that "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part [ERISA Part IV] shall be void as against public policy." As ERISA § 403(a) and ERISA § 404(a) are both under Part IV of ERISA, any provision that attempts to relieve a fiduciary of liability is void pursuant to ERISA § 410(a) unless there is an exception or exemption. No such exemption or exception is applicable here.

104.    Section 11.7(b) of the 2009 Plan Document provides with respect to actions other than those related to Adverse Benefit Determinations (defined in Section 11.7(a) of the Plan Document) as follows:

> [N]o action alleging an omission, violation, or breach of any responsibility, duty, or obligation imposed by this Plan (or any internal rule, guideline, or protocol) or any applicable law may be commenced after the earlier of  --
>
> (l) six years after the date of the omission, violation, or breach, or
>
> (2) three years after the earliest date on which the plaintiff had actual or constructive knowledge of the omission, violation, or breach,

except as provided in ERISA section 413 (but only where the fraud or concealment is separate from the offense and intended to conceal the existence of the offense).

105.    It is not clear what "except as provided in ERISA section 413 (but only where the fraud or concealment is separate from the offense and intended to conceal the existence of the offense)" is intended to convey.

106.    In a section entitled "Limitation on Actions," the SPD states as follows:

With respect to all other types of claims [i.e. other than a benefit claim], you may not commence a legal action in a court after the earlier of

- six years after the date of any omission, violation, or breach of any responsibility, duty, or obligation imposed by the Retirement Plan or applicable laws, or

- three years after the earliest date that you knew or should have known of any such omission, violation, or breach, except that, depending on the facts, certain exceptions may apply.

If you do file a legal action after these limitations periods have expired, the court may dismiss your claim.

107.    The SPD fails to explain the meaning of "depending on the facts, certain exceptions may apply" and does not provide any explanation, examples, or illustration of what facts would result in an exception or under what circumstances those exceptions may apply.  By failing to do to, the SPD violates ERISA § 102, 29 U.S.C. § 1022.

108.    By contrast, ERISA § 413, 29 U.S.C. § 1113 provides as follows:

No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of—

(1)  six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or

31

(2)    three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;

except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

109.    Importantly, unlike Section 11.7(b) of the Plan Document, ERISA § 413 does *not* have a provision that applies a *constructive knowledge* standard to limitations on actions with respect to a fiduciary's breach of any responsibility, duty, or obligation under Part IV of ERISA. In fact, Congress specifically rejected and removed a constructive knowledge standard from being imposed to limitations on actions with respect to a fiduciary's breach of any responsibility, duty, or obligation under Part IV of ERISA.

110.    To the extent that Section 11.7(b) of the 2009 Plan Document (or any other written instrument agreement) attempts to relieve these Defendants of their responsibility or liability to discharge their fiduciary duties under ERISA Part IV prior to the time that ERISA § 413 would not and ERISA § 413 would permit such an action, Section 11.7(b) of the Plan Document is void as against public policy.

111.    To the extent that any of the fiduciaries of the Plan would agree to such a provision that is void against public policy under ERISA § 410, and the meaning of such a provision was not sufficiently disclosed in the SPD as required by ERISA § 102 and the applicable DOL Regulations, Defendants breached their fiduciary duties under ERISA by failing to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries (A) for the exclusive purpose of providing benefits to participants and beneficiaries and (B) with the care, skill, prudence and diligence under the circumstances then prevailing that

a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and aims, in violation of ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B).

112.    To the extent that Section 11.7(b) of the 2009 Plan Document (or any other written instrument agreement) attempts to relieve these Defendants of their liability for failure to discharge their fiduciary duties owed to Plaintiff and the Class at a time different than provided under ERISA § 413, Section 11.7(b) should be declared void and the terms of the Plan Document should be reformed accordingly.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of himself and the Class, pray that judgment be entered against Defendants on all claims, and request that the Court order or award the following relief:

A.    Declare that each of the above fiduciary Defendants breached his, her or its fiduciary duties under ERISA.

B.    Declare that the Plan Administrator has violated ERISA § 102, 29 U.S.C. § 1022.

C.    Order that the Plan Administrator of the Plan must disclose the standards for reclassification in the SPD and in other disclosures in language understood by the average participant in this Plan, that such disclosures will not use legal jargon or legal terms and that the disclosures must use clarifying examples to explain the meaning of "clear and convincing evidence" or "changed circumstances" to Plan participants in those documents.

D.     Declare that all denials of reclassifications by any member of the Class based on either lack of "clear and convincing evidence" or lack of "changed circumstances" under the Board's prior interpretation are void.

E.     Enter an Order either (1) reforming the reclassification process and determining that the terms "clear and convincing evidence" and "changed circumstances" must be interpreted according to the ordinary meaning of those terms as understood by the average participant in this Plan or (2) determine that the initial classification is voidable at the option of each member of the Class and require that Defendants allow Plaintiff and each member of the Class to make a claim for benefits as their initial classification, whichever is in the best interests of the Class.

F.     Order that to the extent that any of the members of the Class successfully obtain reclassification or increased benefits following the entry of this Court's Order, that Defendants must be pre-judgment interest from the date of their initial request for reclassification.

G.     Impose a surcharge against the breaching fiduciaries in the amount of attorneys' fees or expenses incurred by Plaintiff and members of the Class who incurred such fees and expenses in connection with their initial request for reclassification which was denied utilizing Defendants undisclosed interpretation of the phrase "changed circumstances."

H.     Declare that the 2017 Amendment and its revised standards for reclassification do not apply to Plaintiff and the Class.

I.     Declare that Section 11.7(b) violates ERISA § 410, 29 U.S.C. § 1110, and is null and void to the extent that it conflicts with ERISA § 413, 29 U.S.C. § 1113 and reform the Plan accordingly.

J.      Order the removal any of the breaching fiduciaries from their position as fiduciaries for the Plan and enjoin any of the breaching fiduciaries from acting as fiduciaries for any plan that covers any members of the Class and to the extent necessary, appoint an independent fiduciary to act as the Retirement Board at the expense of the Defendants.

K.      Require Defendants to pay attorney's fees and the costs of this action pursuant to ERISA §502(g)(1), 29 U.S.C. § 1132(g)(1) and/or ordering the payment of reasonable fees and expenses of this action to Plaintiffs' Counsel on the basis of the common benefit and/or common fund doctrine (and/or other applicable law) out of any money or benefit recovered for the Class and Subclasses in this action.

L.      Award any such other relief that the Court determines that Plaintiffs and the Class are entitled pursuant to ERISA §502(a), 29 U.S.C. § 1132(a) and pursuant to Rule 54(c) of the Federal Rules of Civil Procedure or otherwise.

Dated: May 21, 2018                                Respectfully submitted,


                                                   /s/ Robert I. Harwood
                                                   Robert I. Harwood
                                                   Daniella Quitt
                                                   GLANCY PRONGAY & MURRAY LLP
                                                   712 Fifth Avenue
                                                   New York NY 10019
                                                   Telephone: (212) 935-7400
                                                   Email: rharwood@glancylaw.com
                                                   Email: dquitt@glancylaw.com

                                                   Robert A. Donati
                                                   *Pro hac vice application to be filed*
                                                   William B. Ryan
                                                   *Pro hac vice application to be filed*
                                                   DONATI LAW, PLLC
                                                   1545 Union Avenue
                                                   Memphis, TN 38104
                                                   Telephone: (901) 278-1004
                                                   Email: robert@donatilawfirm.com

                                                   R. Joseph Barton
                                                   *Pro hac vice application to be filed*
                                                   BLOCK & LEVITON LLP
                                                   1735 20th Street NW
                                                   Washington, DC 20009
                                                   Telephone: (202) 734-7046
                                                   Email:  jbarton@blockesq.com

                                                   *Attorneys for Plaintiff*